*138 Justice Alito
delivered the opinion of the Court.
In two cases decided more than 30 years ago, this Court referred broadly to a constitutional privacy “interest in avoiding disclosure of personal matters.” Whalen v. Roe, 429 U. S. 589, 599-600 (1977); Nixon v. Administrator of General Services, 433 U. S. 425, 457 (1977). Respondents in this case, federal contract employees at a Government laboratory, claim that two parts of a standard employment background investigation violate their rights under Whalen and Nixon. Respondents challenge a section of a form questionnaire that asks employees about treatment or counseling for recent illegal-drug use. They also object to certain open-ended questions on a form sent to employees’ designated references.
We assume, without deciding, that the Constitution protects a privacy right of the sort mentioned in Whalen and Nixon. We hold, however, that the challenged portions of the Government’s background check do not violate this right in the present case. The Government’s interests as employer and proprietor in managing its internal operations, combined with the protections against public dissemination provided by the Privacy Act of 1974, 5 U. S. C. § 552a (2006 ed. and Supp. IV), satisfy any “interest in avoiding disclosure” that may “arguably ha[ve] its roots in the Constitution.” Whalen, supra, at 599, 605.
I
A
The National Aeronautics and Space Administration (NASA) is an independent federal agency charged with planning and conducting the Government’s “space activities." Pub. L. 111-314, §3, 124 Stat. 3333, 51 U. S. C. § 20112(a)(1). NASA’s work force numbers in the tens of thousands of employees. While many of these workers are federal civil servants, a substantial majority are employed directly by *139 Government contractors. Contract employees play an important role in NASA’s mission, and their duties are functionally equivalent to those performed by civil servants.
One NASA facility, the Jet Propulsion Laboratory (JPL) in Pasadena, California, is staffed exclusively by contract employees. NASA owns JPL, but the California Institute of Technology (Cal Tech) operates the facility under a Government contract. JPL is the lead NASA center for deep-space robotics and communications. Most of this country’s unmanned space missions — from the Explorer 1 satellite in 1958 to the Mars Rovers of today — have been developed and run by JPL. JPL scientists contribute to NASA earth-observation and technology-development projects. Many JPL employees also engage in pure scientific research on topics like “the star formation history of the universe” and “the fundamental properties of quantum fluids.” App. 64-65, 68.
Twenty-eight JPL employees are respondents here. Many of them have worked at the lab for decades, and none has ever been the subject of a Government background investigation. At the time when respondents were hired, background cheeks were standard only for federal civil servants. See Exec. Order No. 10450, 3 CFR 936 (1949-1953 Comp.). In some instances, individual contracts required background checks for the employees of federal contractors, but no blanket policy was in place.
The Government has recently taken steps to eliminate this two-track approach to background investigations. In 2004, a recommendation by the 9/11 Commission prompted the President to order new, uniform identification standards for “[fjederal employees,” including “contractor employees.” Homeland Security Presidential Directive/HSPD-12 — Policy for a Common Identification Standard for Federal Employees and Contractors, Public Papers of the President, George W. Bush, Vol. 2, Aug. 27, p. 1765 (2007) (hereinafter HSPD-12), App. 127. The Department of Commerce implemented this *140 directive by mandating that contract employees with long-term access to federal facilities complete a standard background check, typically the National Agency Check with Inquiries (NACI). National Inst, of Standards and Technology, Personal Identity Verification of Federal Employees & Contractors, pp. iii-vi, 1-8, 6 (FIPS PUB 201-1, Mar. 2006) (hereinafter FIPS PUB 201-1), App. 131-150, 144-145.[1]
An October 2007 deadline was set for completion of these investigations. Memorandum from Joshua B. Bolten, Director, OMB, to the Heads of all Departments and Agencies (Aug. 5, 2005), App. 112. In January 2007, NASA modified its contract with Cal Tech to reflect the new background-check requirement. JPL management informed employees that anyone failing to complete the NACI process by October 2007 would be denied access to JPL and would face termination by Cal Tech.
B
The NACI process has long been the standard background investigation for prospective civil servants. The process begins when the applicant or employee fills out a form questionnaire. Employees who work in “non-sensitive” positions (as all respondents here do) complete Standard Form 85 (SF-85). Office of Personnel Management (OPM), Standard Form 85, Questionnaire for Non-Sensitive Positions, App. 88-95.[2]
*141 Most of the questions on SF-85 seek basic biographical information: name, address, prior residences, education, employment history, and personal and professional references. The form also asks about citizenship, selective-service registration, and military service. The last question asks whether the employee has “used, possessed, supplied, or manufactured illegal drugs” in the last year. Id., at 94. If the answer is yes, the employee must provide details, including information about “any treatment or counseling received.” Ibid. A “truthful response,” the form notes, cannot be used as evidence against the employee in a criminal proceeding. Ibid. The employee must certify that all responses on the form are true and must sign a release authorizing the Government to obtain personal information from schools, employers, and others during its investigation.
Once a completed SF-85 is on file, the “agency check” and “inquiries” begin. 75 Fed. Reg. 5359 (2010). The Government runs the information provided by the employee through FBI and other federal-agency databases. It also sends out form questionnaires to the former employers, schools, landlords, and references listed on SF-85. The particular form at issue in this case — the Investigative Request for Personal Information, Form 42 — goes to the employee’s former landlords and references. Ibid.[3]
Form 42 is a two-page document that takes about five minutes to complete. See ibid. It explains to the reference that “[y]our name has been provided by” a particular employee or applicant to help the Government determine that person’s “suitability for employment or a security clearance.” App. 96-97. After several preliminary questions about the extent of the reference’s associations with the employee, the form asks if the reference has “any reason to question” the *142 employee’s “honesty or trustworthiness.” Id., at 97. It also asks if the reference knows of any “adverse information” concerning the employee’s “violations of the law,” “financial integrity,” “abuse of alcohol and/or drugs,” “mental or emotional stability,” “general behavior or conduct,” or “other matters.” Ibid. If “yes” is cheeked for any of these categories, the form calls for an explanation in the space below. That space is also available for providing “additional information” (“derogatory” or “positive”) that may bear on “suitability for government employment or a security clearance.” Ibid.
All responses to SF-85 and Form 42 are subject to the protections of the Privacy Act. The Act authorizes the Government to keep records pertaining to an individual only when they are “relevant and necessary” to an end “required to be accomplished” by law. 5 U. S. C. § 552a(e)(1). Individuals are permitted to access their records and request amendments to them. §§ 552a(d)(1), (2). Subject to certain exceptions, the Government may not disclose records pertaining to an individual without that individual’s written consent. § 552a(b).
C
About two months before the October 2007 deadline for completing the NACI, respondents brought this suit, claiming, as relevant here, that the background-check process violates a constitutional right to informational privacy. App. 82 (Complaint for Injunctive and Declaratory Relief).[4] The District Court denied respondents’ motion for a preliminary injunction, but the Ninth Circuit granted an injunction pending appeal, 506 F. 3d 713 (2007), and later reversed the District Court’s order. The court held that portions of both SF-85 and Form 42 are likely unconstitutional and should be preliminarily enjoined. 512 F. 3d 1134, vacated and superseded, 530 F. 3d 865 (2008).
*143 Turning first to SF-85, the Court of Appeals noted respondents’ concession “that most of the questions” on the form are “unproblematic” and do not “implicate the constitutional right to informational privacy.” 530 F. 3d, at 878. But the court determined that the “group of questions concerning illegal drugs” required closer scrutiny. Ibid. Applying Circuit precedent, the court upheld SF-85’s inquiries into recent involvement with drugs as “necessary to further the government’s legitimate interest” in combating illegal-drug use. Id., at 879. The court went on to hold, however, that the portion of the form requiring disclosure of drug “treatment or counseling” furthered no legitimate interest and was thus likely to be held unconstitutional. Ibid.
Form 42, in the Court of Appeals’ estimation, was even “more problematic.” Ibid. The form’s “open-ended and highly private” questions, the court concluded, were not “narrowly tailored” to meet the Government’s interests in verifying contractors’ identities and “ensuring the security of the JPL.” Id., at 881, 880. As a result, the court held, these “open-ended” questions, like the drug-treatment question on SF-85, likely violate respondents’ informational-privacy rights.[5]
*144 Over the dissents of five judges, the Ninth Circuit denied rehearing en banc. 568 F. 3d 1028 (2009). We granted certiorari. 559 U. S. 990 (2010).
II
As noted, respondents contend that portions of SF-85 and Form 42 violate their “right to informational privacy.” Brief for Respondents 15. This Court considered a similar claim in Whalen, 429 U. S. 589, which concerned New York’s practice of collecting “the names and addresses of all persons” prescribed dangerous drugs with both “legitimate and illegitimate uses.” Id., at 591. In discussing that claim, the Court said that “[t]he cases sometimes characterized as protecting ‘privacy’” actually involved “at least two different kinds of interests”: one, an “interest in avoiding disclosure of personal matters”;[6] the other, an interest in “making certain kinds of important decisions” free from government interference.[7] Id., at 598-600. The patients who brought suit in *145 Whalen argued that New York’s statute “threatened] to impair” both their “nondisclosure” interests and their interests in making healthcare decisions independently. Id., at 600. The Court, however, upheld the statute as a “reasonable exercise of New York’s broad police powers.” Id., at 598.
Whalen acknowledged that the disclosure of “private information” to the State was an “unpleasant invasio[n] of privacy,” id., at 602, but the Court pointed out that the New York statute contained “security provisions” that protected against “[p]ublie disclosure” of patients’ information, id., at 600-601. This sort of “statutory or regulatory duty to avoid unwarranted disclosures” of “accumulated private data” was sufficient, in the Court’s view, to protect a privacy interest that “arguably ha[d] its roots in the Constitution.” Id., at 605-606. The Court thus concluded that the statute did not violate “any right or liberty protected by the Fourteenth Amendment.” Id., at 606.
Four months later, the Court referred again to a constitutional “interest in avoiding disclosure.” Nixon, 433 U. S., at 457 (internal quotation marks omitted). Former President Nixon brought a challenge to the Presidential Recordings and Materials Preservation Act, 88 Stat. 1695, note following 44 U. S. C. §2111, a statute that required him to turn over his Presidential papers and tape recordings for archival review and screening. 433 U. S., at 455-465. In a section of the opinion entitled “Privacy,” the Court addressed a combination of claims that the review required by this Act violated the former President’s “Fourth and Fifth Amendmenft]” rights. Id., at 455, and n. 18, 458-459. The Court rejected those challenges after concluding that the Act at issue, like the statute in Whalen, contained protections against “undue dissemination of private materials.” 433 U. S., at 458. Indeed, the Court observed that the former President’s claim was “weaker” than the one “found wanting ... [in] Whalen,” as the Government was required to return immediately all “purely private papers and recordings” identified by the ar *146 chivists. Id., at 458-459. Citing Fourth Amendment precedent, the Court also stated that the public interest in preserving Presidential papers outweighed any “legitimate expectation of privacy” that the former President may have enjoyed. Id., at 458 (citing Katz v. United States, 389 U. S. 347 (1967); Camara v. Municipal Court of City and County of San Francisco, 387 U. S. 523 (1967); and Terry v. Ohio, 392 U. S. 1 (1968)).[8]
The Court announced the decision in Nixon in the waning days of October Term 1976. Since then, the Court has said little else on the subject of an “individual interest in avoiding disclosure of personal matters.” Whalen, supra, at 599; Nixon, supra, at 457. A few opinions have mentioned the concept in passing and in other contexts. See Department of Justice v. Reporters Comm. for Freedom of Press, 489 U. S. 749, 762-763 (1989); New York v. Ferber, 458 U. S. 747, 759, n. 10 (1982). But no other decision has squarely addressed a constitutional right to informational privacy.[9]
*147 III
As was our approach in Whalen, we will assume for present purposes that the Government's challenged inquiries implicate a privacy interest of constitutional significance. 429 U. S., at 599, 605.[10] We hold, however, that, whatever the *148 scope of this interest, it does not prevent the Government from asking reasonable questions of the sort included on SF-85 and Form 42 in an employment background investigation that is subject to the Privacy Act’s safeguards against public disclosure.
A
1
As an initial matter, judicial review of the Government’s challenged inquiries must take into account the context in which they arise. When the Government asks respondents and their references to fill out SF-85 and Form 42, it does not exercise its sovereign power “to regulate or license.” Cafeteria & Restaurant Workers v. McElroy, 367 U. S. 886, 896 (1961). Rather, the Government conducts the challenged background checks in its capacity “as proprietor” and manager of its “internal operation.” Ibid. Time and again our cases have recognized that the Government has a much freer hand in dealing “with citizen employees than it does when it brings its sovereign power to bear on citizens at large.” Engquist v. Oregon Dept. of Agriculture, 553 U. S. 591, 598 (2008); Waters v. Churchill, 511 U. S. 661, 674 (1994) (plurality opinion). This distinction is grounded on the *149 “common-sense realization” that if every “employment decision became a constitutional matter,” the Government could not function. See Connick v. Myers, 461 U. S. 138, 143 (1983); see also Bishop v. Wood, 426 U. S. 341, 350 (1976) (“The Due Process Clause ... is not a guarantee against incorrect or ill-advised personnel decisions”).
An assessment of the constitutionality of the challenged portions of SF-85 and Form 42 must account for this distinction. The questions challenged by respondents are part of a standard employment background check of the sort used by millions of private employers. See Brief for Consumer Data Industry Association et al. as Amici Curiae 2 (hereinafter CDIA Brief) (“[M]ore than 88% of U. S. companies ... perform background checks on their employees”). The Government itself has been conducting employment investigations since the earliest days of the Republic. L. White, The Federalists: A Study in Administrative History 262-263 (1948); see OPM, Biography of An Ideal: History of the Federal Civil Service 8 (2002) (noting that President Washington “set a high standard” for federal office and finalized appointments only after “investigating [candidates’] capabilities and reputations”). Since 1871, the President has enjoyed statutory authority to “ascertain the fitness of applicants” for the civil service “as to age, health, character, knowledge and ability for the employment sought,” Act of Mar. 3,1871, Rev. Stat. § 1753, as amended, 5 U. S. C. § 3301(2), and that Aet appears to have been regarded as a codification of established practice.[11] Standard background investigations similar to those at issue here became mandatory for all candi *150 dates for the federal civil service in 1953. Exec. Order No. 10450, 3 CFR 936. And the particular investigations challenged in this case arose from a decision to extend that requirement to federal contract employees requiring long-term access to federal facilities. See HSPD-12, at 1765, App. 127; FIPS PUB 201-1, at iii-vi, 1-8, App. 131-150.
As this long history suggests, the Government has an interest in conducting basic employment background checks. Reasonable investigations of applicants and employees aid the Government in ensuring the security of its facilities and in employing a competent, reliable work force. See Engquist, supra, at 598-599. Courts must keep those interests in mind when asked to go line by line through the Government’s employment forms and to scrutinize the choice and wording of the questions they contain.
Respondents argue that, because they are contract employees and not civil servants, the Government’s broad authority in managing its affairs should apply with diminished force. But the Government’s interest as “proprietor” in managing its operations, Cafeteria & Restaurant Workers, supra, at 896, does not turn on such formalities. See Board of Comm’rs, Wabaunsee Cty. v. Umbehr, 518 U. S. 668, 678, 679 (1996) (formal distinctions such as whether a “service provider” has a “contract of employment or a contract for services” with the government is a “very poor proxy” for constitutional interests at stake). The fact that respondents’ direct employment relationship is with Cal Tech— which operates JPL under a Government contract — says very little about the interests at stake in this case. The record shows that, as a “practical matter,” there are no “Relevant distinctions” between the duties performed by NASA’s civil-service work force and its contractor work force. App. 221. The two classes of employees perform “functionally equivalent duties,” and the extent of employees’ “access to NASA . . . facilities” turns not on formal status but on the nature of “the jobs they perform.” Ibid.
*151 At JPL, in particular, the work that contract employees perform is critical to NASA’s mission. Respondents in this case include the “lead trouble-shooter for ... th[e] $568 [million]” Kepler space observatory, 7 Record 396; the leader of the program that “tests ... all new technology that NASA will use in space,” App. 60; and one of the lead “trajectory designers for . . . the Galileo Project and the Apollo Moon landings,” id., at 62. This is important work, and all of it is funded with a multibillion-dollar investment from the American taxpayer. See NASA, JPL Annual Report 09, p. 35 (2010), online at http://www.jpl.nasa.gov/annualreport/2009-report.pdf. The Government has a strong interest in conducting basic background checks into the contract employees minding the store at JPL.[12]
2
With these interests in view, we conclude that the challenged portions of both SF-85 and Form 42 consist of reasonable, employment-related inquiries that further the Government’s interests in managing its internal operations. See Engquist, 553 U. S., at 598-599; Whalen, 429 U. S., at 597- *152 598. As to SF-85, the only part of the form challenged here is its request for information about “any treatment or counseling received” for illegal-drug use within the previous year. The “treatment or counseling” question, however, must be considered in context. App. 94. It is a followup to SF-85’s inquiry into whether the employee has “used, possessed, supplied, or manufactured illegal drugs” during the past year. Ibid. The Government has good reason to ask employees about their recent illegal-drug use. Like any employer, the Government is entitled to have its projects staffed by reliable, law-abiding persons who will “ ‘efficiently and effectively’” discharge their duties. See Engquist, supra, at 598-599. Questions about illegal-drug use are a useful way of figuring out which persons have these characteristics. See, e. g., Breen & Matusitz, An Updated Examination of the Effects of Illegal Drug Use in the Workplace, 19 J. Human Behavior in the Social Environment 434 (2009) (illicit drug use negatively correlated with workplace productivity).
In context, the followup question on “treatment or counseling” for recent illegal-drug use is also a reasonable, employment-related inquiry. The Government, recognizing that illegal-drug use is both a criminal and a medical issue, seeks to separate out those illegal-drug users who are taking steps to address and overcome their problems. The Government thus uses responses to the “treatment or counseling” question as a mitigating factor in determining whether to grant contract employees long-term access to federal facilities.[13]
*153 This is a reasonable, and indeed a humane, approach, and respondents do not dispute the legitimacy of the Government’s decision to use drug treatment as a mitigating factor in its contractor credentialihg decisions. Respondents’ argument is that, if drug treatment is only used to mitigate, then the Government should change the mandatory phrasing of SF-85 — “Include [in your answer] any treatment or counseling received” — so as to make a response optional. App. 94. As it stands, the mandatory “treatment or counseling” question is unconstitutional, in respondents’ view, because it is “more intrusive than necessary to satisfy the government’s objective.” Brief for Respondents 26; 530 F. 3d, at 879 (holding that “treatment or counseling” question should be enjoined because the form “appears to compel disclosure”).
We reject the argument that the Government, when it requests job-related personal information in an employment background check, has a constitutional burden to demonstrate that its questions are “necessary” or the least restrictive means of furthering its interests. So exacting a standard runs directly contrary to Whalen. The patients in Whalen, much like respondents here, argued that New York’s statute was unconstitutional because the State could not “demonstrate the necessity” of its program. 429 U. S., at 596. The Court quickly rejected that argument, concluding that New York’s collection of patients’ prescription information could “not be held unconstitutional simply because” a court viewed it as “unnecessary, in whole or in part.” Id., at 596-597.
That analysis applies with even greater force where the Government acts, not as a regulator, but as the manager of its internal affairs. See Engquist, supra, at 598-599. SF-85’s “treatment or counseling” question reasonably seeks to identify a subset of acknowledged drug users who are attempting to overcome their problems. The Government’s considered position is that phrasing the question in more permissive terms would result in a lower response rate, and *154 the question’s effectiveness in identifying illegal-drug users who are suitable for employment would be “materially reduced.” Reply Brief for Petitioners 19. That is a reasonable position, falling within the “ 'wide latitude’ ” granted the Government in its dealings with employees. See Engquist, 553 U. S., at 600.
3
The Court of Appeals also held that the broad, “open-ended questions” on Form 42 likely violate respondents’ informational-privacy rights. Form 42 asks applicants’ designated references and landlords for “information” bearing on “suitability for government employment or a security clearance.” App. 97. In a series of questions, the Government asks if the reference has any “adverse information” about the applicant’s “honesty or trustworthiness,” “violations of the law,” “financial integrity,” “abuse of alcohol and/ or drugs,” “mental or emotional stability,” “general behavior or conduct,” or “other matters.” Ibid.
These open-ended inquiries, like the drug-treatment question on SF-85, are reasonably aimed at identifying capable employees who will faithfully conduct the Government’s business. See Engquist, supra, at 598-599. Asking an applicant’s designated references' broad, open-ended questions about job suitability is an appropriate tool for separating strong candidates from weak ones. It would be a truly daunting task to catalog all the reasons why a person might not be suitable for a particular job, and references do not have all day to answer a laundry list of specific questions. See CDIA Brief 6-7 (references “typically have limited time to answer questions from potential employers,” and “open-ended questions” yield more relevant information than narrow inquiries). Form 42, by contrast, takes just five minutes to complete. 75 Fed. Reg. 5359.
The reasonableness of such open-ended questions is illustrated by their pervasiveness in the public and private sectors. Form 42 alone is sent out by the Government over 1.8 *155 minion times annually. Ibid. In addition, the use of open-ended questions in employment background checks appears to be equally commonplace in the private sector. See, e. g., S. Bock et al., Mandated Benefits 2008 Compliance Guide, Exh. 20.1, A Sample Policy on Reference Checks on Job Applicants (“Following are the guidelines for conducting a telephone reference check: . . . Ask open-ended questions, then wait for the respondent to answer”); M. Zweig, Human Resources Management 87 (1991) (“Also ask, Ts there anything else I need to know about [candidate’s name]?’ This kind of open-ended question may turn up all kinds of information you wouldn’t have gotten any other way”). The use of similar open-ended questions by the Government is reasonable and furthers its interests in managing its operations.
B
1
Not only are SF-85 and Form 42 reasonable in light of the Government interests at stake, they are also subject to substantial protections against disclosure to the public. Both Whalen and Nixon recognized that government “accumulation” of “personal information” for “public purposes” may pose a threat to privacy. Whalen, supra, at 605; see Nixon, 433 U. S., at 457-458, 462. But both decisions also stated that a “statutory or regulatory duty to avoid unwarranted disclosures” generally allays these privacy concerns. Whalen, supra, at 605; Nixon, supra, at 458-459. The Court in Whalen, relying on New York’s “security provisions” prohibiting public disclosure, turned aside a challenge to the collection of patients’ prescription information. 429 U. S., at 594, and n. 12, 600-601, 605. In Nixon, the Court rejected what it regarded as an even “weaker” claim by the former President because the Presidential Recordings and Materials Preservation Act “[n]ot only . . . mandate[d] regulations” against “undue dissemination,” but also required im *156 mediate return of any “purely private” materials flagged by the Government’s archivists. 433 U. S., at 458-459.
Respondents in this case, like the patients in Whalen and former President Nixon, attack only the Government’s collection of information on SF-85 and Form 42. And here, no less than in Whalen and Nixon, the information collected is shielded by statute from “unwarranted disclosure]. ” See Whalen, supra, at 605. The Privacy Act, which covers all information collected during the background-check process, allows .the Government to maintain records “about an individual” only to the extent the records are “relevant and necessary to accomplish” a purpose authorized by law. 5 U. S. C. § 552a(e)(l). The Act requires written consent before the Government may disclose records pertaining to any individual. § 552a(b). And the Act imposes criminal liability for willful violations of its nondisclosure obligations. §552a(i)(1). These requirements, as we have noted, give “forceful recognition” to a Government employee’s interest in maintaining the' “confidentiality of sensitive information . . . in his personnel files.” Detroit Edison Co. v. NLRB, 440 U. S. 301, 318, n. 16 (1979). Like the protections against disclosure in Whalen and Nixon, they “evidence a proper concern” for individual privacy. Whalen, supra, at 605; Nixon, supra, at 458-459.
2
Notwithstanding these safeguards, respondents argue that statutory exceptions to the Privacy Act’s disclosure bar, see §§552a(b)(1)-(12), leave its protections too porous to supply a meaningful check against “unwarranted disclosures,” Whalen, supra, at 605. Respondents point in particular to what they describe as a “broad” exception for “routine use[s],” defined as uses that are “compatible with the purpose for which the record was collected.” §§ 552a(b)(3), (a)(7).
Respondents’ reliance on these exceptions rests on an incorrect reading of both our precedents and the terms of the *157 Privacy Act. As to our cases, the Court in Whalen and Nixon referred approvingly to statutory or regulatory protections against “unwarranted disclosures” and “undue dissemination” of personal information collected by the Government. Whalen, supra, at 605; Nixon, supra, at 458. Neither case suggested that an ironclad disclosure bar is needed to satisfy privacy interests that may be “rootled] in the Constitution.” Whalen, supra, at 605. In Whalen, the New York statute prohibiting “[p]ublie disclosure of the identity of patients” was itself subject to several exceptions. 429 U. S., at 594-595, and n. 12. In Nixon, the protections against “undue dissemination” mentioned in the opinion were not even before the Court, but were to be included in forthcoming regulations “mandate[d]” by the challenged Act. 433 U. S., at 458; see id., at 437-439 (explaining that the Court was limiting its review to the Act’s “facial validity” and was not considering the Administrator’s forthcoming regulations). Thus, the mere fact that the Privacy Act’s nondisclosure requirement is subject to exceptions does not show that the statute provides insufficient protection against public disclosure.
Nor does the substance of the “routine use” exception relied on by respondents create any undue risk of public dissemination. None of the authorized “routine use[s]” of respondents’ background-check information allows for release to the public. 71 Fed. Reg. 45859-45860, 45862 (2006); 60 Fed. Reg. 63084 (1995), as amended, 75 Fed. Reg. 28307 (2010). Rather, the established “routine use[s]” consist of limited, reasonable steps designed to complete the background-cheek process in an efficient and orderly manner. See Whalen, supra, at 602 (approving disclosures to authorized New York Department of Health employees that were not “meaningfully distinguishable” from routine disclosures “associated with many facets of health care”). One routine use, for example, involves a limited disclosure to persons fill *158 ing out Form 42 so that designated references can “identify the individual” at issue and can understand the “nature and purpose of the investigation.” App. 89. Authorized JPL employees also review each completed SF-85 to verify that all requested information has been provided. Id., at 211. These designated JPL employees may not “disclose any information contained in the form to anyone else,” ibid., and Cal Tech is not given access to adverse information uncovered during the Government’s background check, id., at 207-208. The “remote possibility” of public disclosure created by these narrow “routine use[s]” does not undermine the Privacy Act’s substantial protections. See Whalen, 429 U. S., at 601-602 (“remote possibility” that statutory security provisions will “provide inadequate protection against unwarranted disclosures” not a sufficient basis for striking down statute).
Citing past violations of the Privacy Act,[14] respondents note that it is possible that their personal information could be disclosed as a result of a similar breach. But data breaches are a possibility any time the Government stores information. As the Court recognized in Whalen, the mere possibility that security measures will fail provides no “proper ground” for a broad-based attack on government information-collection practices. Ibid. Respondents also cite a portion of SF-85 that warns of possible disclosure “[t]o the news media or the general public.” App. 89. By its terms, this exception allows public disclosure only where release is “in the public interest” and would not result in “an unwarranted invasion of personal privacy.” Ibid. Respondents have not cited any example of such a disclosure, nor have they identified any plausible scenario in which *159 their information might be unduly disclosed under this exception.[15]
In light of the protection provided by the Privacy Act’s nondisclosure requirement, and because the challenged portions of the forms consist of reasonable inquiries in an employment background check, we conclude that the Government’s inquiries do not violate a constitutional right to informational privacy. Whalen, supra, at 605.
* * *
For these reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

Justice Kagan took no part in the consideration or decision of this case.

 As alternatives to the NACI process, the Department of Commerce also authorized federal agencies to use another “Office of Personnel Management ... or National Security community investigation required for Federal employment.” App. 145. None of these alternative background checks are at issue here.

 For public-trust and national-security positions, more detailed forms are required. See OPM, Standard Form 85P, Questionnaire for Public Trust Positions, online at http://www.opm.gov/Forms/pdf_fill/sf85p.pdf (all Internet materials as visited Jan. 13, 2011, and available in Clerk of Court’s case file); OPM, Standard Form 86, Questionnaire for National Security Positions, online at http://www.opm.gov/Forms/pdf_fill/sf86.pdf.

 The Government sends separate forms to employers (Form 41), educational institutions (Form 43), record repositories (Form 40), and law enforcement agencies (Form 44). 75 Fed. Reg. 5359. None of these forms are at issue here.

 Respondents sought to represent a class of “JPL employees in nonsensitive positions.” App. 79. No class has been certified.

 In the Ninth Circuit, respondents also challenged the criteria that they believe the Government will use to determine their “suitability” for employment at JPL. Respondents relied on a document, which had been temporarily posted on the JPL intranet, that listed factors purportedly bearing on suitability for federal employment. App. 98-104. Among the listed factors were a failure to “mee[t] financial obligations,” “health issues,” and “mental, emotional, psychological, or psychiatric issues.” Id., at 98, 102. Other factors, which were listed under the heading “Criminal or Immoral Conduct,” included “indecent exposure,” “voyeurism,” “indecent proposal[s],” and “carnal knowledge.” Id., at 98. The document also stated that while “homosexuality,” “adultery,” and “illegitimate children” were not “suitability” issues in and of themselves, they might pose “security issue[s]” if circumstances indicated a “susceptibility to coercion or blaekmail.” Id., at 102. The Court of Appeals rejected respondents’ “challenges to . . . suitability determination[s]” as unripe. 530 F. 3d, at *144 873. Although respondents did not file a cross-petition from that portion of the Ninth Circuit’s judgment, they nonetheless discuss these suitability criteria at some length in their brief before this Court. Respondents’ challenge to these criteria is not before us. We note, however, the Acting Solicitor General’s statement at oral argument that “NASA will not and does not use” the document to which respondents object “to make contractor credentialing decisions.” Tr. of Oral Arg. 22.

 429 U. S., at 598-599, and n. 25 (citing Olmstead v. United States, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting) (describing “the right to be let alone” as “the right most valued by civilized men”); Griswold v. Connecticut, 381 U. S. 479, 483 (1965) (“[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion”); Stanley v. Georgia, 394 U. S. 557, 559, 568 (1969); California Bankers Assn. v. Shultz, 416 U. S. 21, 79 (1974) (Douglas, J., dissenting); and id., at 78 (Powell, J., concurring)).

 429 U. S., at 599-600, and n. 26 (citing Roe v. Wade, 410 U. S. 113 (1973); Doe v. Bolton, 410 U. S. 179 (1973); Loving v. Virginia, 388 U. S. 1 (1967); Griswold v. Connecticut, supra; Pierce v. Society of Sisters, 268 U. S. 510 (1925); Meyer v. Nebraska, 262 U. S. 390 (1923); and Allgeyer v. Louisiana, 165 U. S. 587 (1897)).

 The Court continued its discussion of Fourth Amendment principles throughout the “Privacy” section of the opinion. See 433 U. S., at 459 (citing United States v. Miller, 425 U. S. 435 (1976), United States v. Dionisio, 410 U. S. 1 (1973), and Katz, 389 U. S. 347); 433 U. S., at 460-462 (addressing the former President’s claim that the Act was “tantamount to a general warrant” under Stanford v. Texas, 379 U. S. 476 (1965)); 433 U. S., at 463-465, and n. 26 (concluding that the challenged law was analogous to the wiretapping provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, notwithstanding the lack of a “warrant requirement”).

 State and lower federal courts have offered a number of different interpretations of Whalen and Nixon over the years. Many courts hold that disclosure of at least some kinds of personal information should be subject to a test that balances the government’s interests against the individual’s interest in avoiding disclosure. E. g., Barry v. New York, 712 F. 2d 1554, 1559 (CA2 1983); Fraternal Order of Police v. Philadelphia, 812 F. 2d 105, 110 (CA3 1987); Woodland v. Houston, 940 F. 2d 134, 138 (CA5 1991) (per curiam); In re Crawford, 194 F. 3d 954, 959 (CA9 1999); State v. Russo, 259 Conn. 436, 459-464, 790 A. 2d 1132, 1147-1150 (2002). The Sixth Circuit has held that the right to informational privacy protects only intrusions upon interests “that can be deemed fundamental or implicit in the concept of ordered liberty.” J. P. v. DeSanti, 653 F. 2d 1080, 1090 (1981) *147 (internal quotation marks omitted). The D. C. Circuit has expressed “grave doubts” about the existence of a constitutional right to informational privacy. American Federation of Govt. Employees v. HUD, 118 F. 3d 786, 791 (1997).

 The opinions concurring in the judgment disagree with this approach and would instead provide a definitive answer to the question whether there is a constitutional right to informational privacy. Post, at 164-165 (opinion of Scalia, J.); post, at 169 (opinion of Thomas, J.). One of these opinions expresses concern that our failure to do so will “har[m] our image, if not our self-respect,” post, at 165 (Scalia, J.), and will cause practical problems, post, at 167-168. There are sound reasons for eschewing the concurring opinions’ recommended course.
“The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.” Carducci v. Regan, 714 F. 2d 171, 177 (CADC 1983) (opinion for the court by Scalia, J.). In this case, petitioners did not ask us to hold that there is no constitutional right to informational privacy, and respondents and their amici thus understandably refrained from addressing that issue in detail. It is undesirable for us to decide a matter of this importance in a case in which we do not have the benefit of briefing by the parties and in which potential amici had little notice that the matter might be decided. See Pet. for Cert. 15 (“no need in this case” for broad decision on “the scope of a eonstitutionally-based right to privacy for certain information”). Particularly in cases like this one, where we have only the “scarce and open-ended” guideposts of substantive due process to show us the way, see Collins v. Harker Heights, 503 U. S. 115, 125 (1992), the Court has repeatedly recognized the benefits of proceeding with caution. E. g., Herrera v. Collins, 506 U. S. 390, 417 (1993) (joined by Scalia, J.) (assuming ‘Tor the sake of argument... that in a capital ease a truly persuasive demonstration of ‘actual innocence’ ” made after conviction would render execution unconstitutional); Cruzan v. Director, Mo. Dept. of Health, 497 U. S. 261, 279 (1990) (joined by Scalia, J.) ("[W]e assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition”); Regents of Univ. of Mich. v. Ewing, 474 U. S. 214, 222-223 (1985) (“assuming], without deciding, that federal courts can review an academic decision of a pub- *148 lie educational institution under a substantive due process standard”); Board of Curators of Univ. of Mo. v. Horowitz, 435 U. S. 78, 91-92 (1978) (same); see also New York State Club Assn., Inc. v. City of New York, 487 U. S. 1, 20 (1988) (Scalia, J., concurring in part and concurring in judgment) (joining the Court’s opinion on the understanding that it “assumes for purposes of its analysis, but does not hold, the existence of a constitutional right of private association for other than expressive or religious purposes”).
Justice Scalia provides no support for his claim that our approach in this case will “dramatically increase the number of lawsuits claiming violations of the right to informational privacy,” post, at 168, and will leave the lower courts at sea. We take the' same approach here that the Court took more than three decades ago in Whalen and Nixon, and there is no evidence that those decisions have caused the sky to fall.
We therefore decide the case before us and leave broader issues for another day.

 The debate on the 1871 Act in the House of Representatives contained this exchange on Presidential authority to conduct background checks:
“Mr. Peters: Has he not that power [to conduct the proposed investigations of candidates for the civil service] now?
“Mr. Dawes: He has all that power. If you will go up to the War Department or the Department of the Interior you will see pretty much all of this nailed up on the doors, in the form of rules and regulations.” Cong. Globe, 41st Cong., 3d Sess., 1935 (1871).

 In their brief, respondents also rely on the fact that many of them have been working at JPL for years and that Cal Tech previously vetted them through standard “employment reference checks.” Brief for Respondents 52-53. The record indicates that this may be wrong as a factual matter. E. g., 7 Record 391 (“I have not been required to undergo any type of background investigation to maintain my position with JPL”); id., at 397 (“I have never been required to undergo any type of background investigation to maintain my position with JPL other than . . . [one] which required that I provide only my name, social security number and current address” to facilitate a “cheek for outstanding warrants, arrests or convictions”); id., at 356, 367, 386-387 (similar). Even if it were correct, the fact that Cal Tech once conducted a background check on respondents does not diminish the Government’s interests in conducting its own standard background check to satisfy itself that contract employees should be granted continued access to the Government’s facility. In any event, counsel abandoned this position at oral argument. Tr. of Oral Axg. 38.

 Asking about treatment or counseling could also help the Government identify chronic drug abusers for whom, “despite counseling and rehabilitation programs, there is little chance for effective rehabilitation.” 38 Fed. Reg. 33315 (1973). At oral argument, however, the Acting Solicitor General explained that NASA views treatment or counseling solely as a “mitigat[ing]” factor that ameliorates concerns about recent illegal-drug use. Tr. of Oral Arg. 19.

 E. g., GAO, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown 5, 20 (GAO 07-737, 2007) (over 3-year period, 788 data breaches occurred at 17 federal agencies).

 Respondents further contend that the Privacy Act’s ability to deter unauthorized release of private information is significantly hampered by the fact that the statute provides only “an ex post money-damages action,” not injunctive relief. Brief for Respondents 44 (citing Doe v. Chao, 540 U. S. 614, 635 (2004) (Ginsburg, J., dissenting)). Nothing in Whalen or Nixon suggests that any private right of action — for money damages or injunctive relief — is needed in order to provide sufficient protection against public disclosure.